## OLSEN v. MAINE COAL & DOCK CO.

### No. 1193.

District Court, D. Maine, S. D.
May 8, 1930.

Forrest E. Richardson and N. W. Thompson, both of Portland, Me., for plaintiff.

Verrill, Hale, Booth & Ives, of Portland, Me. (Robert Hale, of Portland, Me., of counsel), for defendant.

PETERS, District Judge.

This is a libel for personal injuries received February 22d ultimo, on board a vessel being discharged of her cargo of soft coal by the respondent corporation while lying at a dock in Bucksport.

The respondent denies negligence on its part, and alleges in the answer that the injuries sustained by the libelant were caused wholly by his own carelessness. The coal was being taken from the hold of the vessel through hatch No. 2 by means of a grab bucket operated by a hoisting engine located on the dock in a house raised somewhat above the level of the dock and about flush with the starboard side of the vessel docked there heading upstream. The hoisting engine was operated by one man, who could see most of the vessel's deck forward of the bridge deck, but could not see the vessel's rail under nim nor a jumbo boom lashed thereto.

The foreman in charge of the unloading testified, as did also the hoisting engineer and the plaintiff. It seems that the vessel had been discharging coal at the dock for four or five days before the accident occurred, the work going on all day, and by night also, to some extent. The grab bucket used in the operation was a heavy and bulky affair weighing over three tons and measuring eight feet high and seven feet from side to side. It was necessary to oil it frequently, and while the vessel was lying at this dock it had been oiled three times a day. On the day of the accident it was oiled about 4:30 o'clock in the afternoon, before darkness set in, preparatory to further work in the evening. To do the oiling the bucket was brought to rest on the deck near the hatch through which the coal was taken out. The oiling operation only took a few minutes and the stevedores in the hold waited while it was going on.

The space between hatch No. 2 and the jumbo boom lashed inside the rail was eleven feet six inches, of which space the bucket occupied about seven feet, leaving slightly over two feet on each side in which to pass by, if the bucket was about in the center. It may have been rather nearer the hatch than the boom, but it had some space all around it. The bucket when at rest with its lips closed cannot set squarely on the deck, but must tip over on one side or the other on account of its shape. On this occasion it had canted over toward the hatch and the attached wire ropes had been slackened. The foreman, who had been on top of the apparatus, returned to the deck, and as he did so he sang out to the hoisting engineer, "All right, Jim." This was the signal to raise the bucket, the oiling having been done. The engineer was in his tower waiting but not directly at the controls. He stepped over to the levers after hearing the signal, which he understood, and took up the slack of the wires attached to the bucket for the purpose of straightening it on the deck preparatory to raising it. Doing this naturally caused the in-shore lip of the bucket to tip downward and toward the starboard rail, sufficiently so to catch the libelant (who was passing at the moment) between the heavy iron bucket and the jumbo boom lashed inside the rail, and injure him.

The libelant, a seaman on the vessel, had been standing just previously on the bridge deck some thirty feet aft of the bucket, on top of which was the foreman, and had been noticed by him. The ship's carpenter had told the libelant to find the "bo'sun" and get a key. Observing the latter on hatch No. 1, the forward hatch, the libelant took the starboard ladder down to the forward deck and was passing by the grab bucket in the narrow space between it and at the lashed boom, toward hatch No. 1, when caught by the tipping side of the bucket.

The crew of the vessel had no duties to perform in connection with the discharging of the cargo of coal.

The libelant, though only nineteen years old, was rated as an able seaman aboard the ship, having previously rated as an ordinary seaman. Though born in Norway and in this country less than two years, he appeared to understand and speak English very well and to be more than ordinarily intelligent. There appeared to be no trouble with his sight or hearing. He had been on the ship since she cleared from Norfolk and for the four or five days that she had been at this dock discharging as described. Quite obviously it was the reckless confidence of an agile youth that prompted him to try to dodge between the bucket and the boom, on his way to the forward hatch, rather than to take the few extra steps necessary to go down the port ladder, or even down the starboard ladder, and to port of the bucket. The bucket couldn't tip any more to port, but would obviously tip to starboard the moment the wires tightened.

This conduct was negligence on the part of the libelant, who must have observed the operation of the bucket for several days and many times the operation of oiling. He says that he thought the bucket had come to rest

for the night and that there was no danger connected with it for that reason; but the stevedores had not come on deck, it was too early to quit for the day, and the bucket was never permitted to lie on the deck all night on account of the rise and fall of the tide. The most that could be claimed for the libelant is that he was only contributorily negligent and that the damages should be divided.

█ This brings up the principal point of the case, which is: To what extent, if at all, was the foreman negligent? The foreman was the agent of the respondent and the only person to whom negligence could be attributed, the engineer in his raised house being simply an automaton executing the orders of the foreman given from below.

The foreman saw the libelant standing on the bridge deck near the starboard ladder while on top of the bucket, the libelant not having made any motion to come down. The foreman immediately climbed down the bucket and took a position forward of it near the hatch, where he could both order the bucket up and warn the men below that it was coming down. He did not look around or back of the bucket to see if any one was coming. If he had moved a few feet, he undoubtedly could and would have seen the seaman coming toward him. If nothing else had been done except to suddenly move the bucket, or if the foreman had used the deaf and dumb language in communicating with the engineer above, it might be that the foreman would be held guilty of negligence— though it should be remembered that this was rough, hard work engaged in by rough, hard men (evidently intelligent and highly competent on their jobs), that there was no occasion to look out for women and children, and that able seamen on the ship were expected to make way for the work.

It appears, however, that after the foreman stepped from the bucket to the deck and saw, as he supposed, everything clear, he cried out to the engineer, "All right, Jim," as above mentioned, loud enough to reach his ears inside the house. The libelant, nearer to the foreman, in the open air, with ears much younger than Jim's, couldn't have failed to hear the same words. He must have known what they meant, being no stranger to the operations, and, he had plenty of time to stop if he was going toward the bucket (as he must have been), because the engineer, "Jim," was not at his post but had to take time to move some feet over to the levers used in starting the machinery.

I cannot escape the conclusion that it suddenly entered the mind of the young seaman that he could dodge by before the thing could get in motion, and that he was too confident.

The foreman's vocal signal to the engineer, understood by the people in the vicinity, was as good a warning as if he had given personal notice to all the seamen within hearing. In addition to that, at about the same time he leaned over the hatch and shouted to the men below to look out.

I feel sympathetic with the libelant, but I cannot find that he has shown negligence on the part of the defendant upon which he can base a recovery.

Judgment for defendant, with costs.